Duncan *v.* Watson.

---

STEPHEN DUNCAN *vs.* LEWIS C. WATSON, administrator, &c.

There is no privity of interest in many respects, between the original administrator, and the administrator *de bonis non* of an estate; but in many other respects, the acts of the administrator within the sphere of his duty and power, are obligatory upon his successor so far as to charge the estate. Such acts bind the administrator *de bonis non*, because the estate came to his hands charged with them by acts of the administrator, which he might legitimately do in the management of the estate while in his hands.

It is clear that an administrator may make admissions which will bind the estate, provided he acts in good faith and with due regard to the best interests of the estate, and in a matter necessarily connected with its administration; and this is especially the case where, as in this instance, the contract which was incomplete at the death of the intestate, devolves upon the administrator, who stood in the place of the intestate when the note became due.

In weighing testimony, a jury cannot find for the plaintiff on the ground of preponderance of evidence, unless the evidence in the case is sufficient to prove the truth of all the facts on which the plaintiff's right to recover depends, to the satisfaction of the jury.

IN error from the circuit court of Claiborne county; Hon. Stanhope Posey, judge.

The following errors are assigned for the reversal of the judgment of the court below, by counsel for the appellant.

1. That the circuit court of Claiborne county erred in ruling out the answers of witness, W. R. Vernon, to the fourth, seventh, and eighth interrogatories, as marked and ruled out in the deposition of said Vernon.

2. That said circuit court erred in ruling out and excluding from the jury the letter of James Watson as set out in the record.

3. That said circuit court erred in ruling out and excluding from the jury the deposition of Hugh Montgomery, taken by consent, as set out in the record.

4. That said circuit court erred in ruling out the oral testimony of Hugh Montgomery, as offered in court and set out in the record.

5. That said circuit court erred in ruling out the reading of Mitchell's Geography, as geographical evidence of the name of Port Gibson and Gibson Port.

6. That said circuit court erred in giving the first, second, and third charges asked by defendant, as set out in the record.

7. That said circuit court erred in refusing to give the fourth instruction asked by the plaintiff to the jury, and in modifying said charge by merging it into the second charge given for the defendant.

Wherefore and because of divers other errors in the record and proceedings aforesaid, he prays the judgment aforesaid may be reversed.

At the November term, 1839, of the Claiborne circuit court, Duncan brought his action of assumpsit against James Watson, administrator of Benjamin Blanton, upon a note made by Cicero Jefferson for $1,100, in favor of and indorsed by said Blanton, dated December 24, 1832, and payable January 1, 1836, at the Bank of the State of Mississippi, with ten per cent. interest after maturity, being for a *bonâ fide* loan of money. The defendant pleaded the general issue.

At the November term, 1840, the cause was tried, and a verdict rendered in favor of the plaintiff; a new trial was granted by the court.

Duncan *v.* Watson.

At the May term, 1842, another trial was had, and a verdict rendered in favor of the defendant. The plaintiff prosecuted a writ of error, and the judgment was reversed by the high court, and the cause remanded.

At the October term, 1846, it being shown to the court, that James Watson had settled his final account as administrator of Blanton, and resigned his letters, and that letters of administration *de bonis non* had been granted to Lewis C. Watson, it was, by consent of counsel, ordered that the suit abate as to James Watson, and be revived against Lewis C. Watson, as administrator *de bonis non* of Blanton.

On the 27th of October, 1846, the defendant filed in the clerk's office, his affidavit for the taking of the deposition of James Watson *de bene esse;* upon which a commission was duly issued to Nicholas M'Dougall, commissioned to take said deposition.

At the April term, 1848, the case was again tried, and a verdict rendered for the plaintiff; a new trial was granted by the court.

At the April term, 1850, another trial was had; a verdict rendered in favor of the defendant, and a new trial granted.

At the April term, 1852, the case was again tried, and a verdict rendered for the defendant. No application was made for a new trial. The plaintiff took a bill of exceptions, which presents the following state of facts: —

The plaintiff read in evidence the note sued upon, and then offered the deposition of Vernon, in connection with the notarial record and protest of Lyons, and the memorandum thereon.

Vernon deposes that he was acquainted with Lyons, who died in February, 1837. That Lyons was a notary-public in Natchez in 1835, 1836, and part of 1837; deponent was a clerk in his store from 1825 to 1829, and again in 1831, 1832, and 1833, and is well acquainted with his style of writing; deponent boarded with Lyons several years, and was boarding with him in January, 1836; Lyons' health was bad for many years previous to his death, and deponent often wrote out his protests; deponent often requested him to let him do so, even when his business did not require his assistance; on days when

he had more writing in his office than he could do in time for the mails, deponent invariably assisted him. Lyons kept a regular and true record of his notarial acts. Deponent placed his notarial records in the Adams probate clerk's office, some time after his death, and having often had to examine them, has always found them there, the original being then before him, he deposes that it is a true copy, and deposes that he has examined the original notarial record of the protest of said note on January 4, 1836. The blanks were filled up by Lyons; he used blank protests bound in book form; the wording was done by him in his own handwriting. Deponent assisted Lyons in making out protests on the 4th of January, 1836, and assisted on the same day in making out notices of protest, but cannot state any thing of his own knowledge, of the protesting or giving notices to the indorsers of this particular note.

All of the foregoing deposition of Vernon was read in evidence to the jury.

The following portion of his deposition was objected to by the counsel of defendant, and was ruled out by the court, namely, all of that part of his answer to fourth interrogatory, wherein he details the usual habit of Lyons in regard to making demand, protesting, and giving notice of non-payment of notes, drafts, &c.; all of that part of his answer to seventh interrogatory, wherein he gives his understanding of the words " notice to Jas. Watson, Admr. of Blanton, G. Port;" all of his answer to eighth interrogatory, in which he repeats the usual habit of Lyons, and the construction he puts upon the aforesaid words, " notice, &c."

The notarial record and protest states that on this 4th day of January, 1836, he, Lyons, at the request of A. P. Merrill, the holder of the note, went to the cashier of the bank of the State of Mississippi, and demanded payment of said note, which was refused. Whereupon he protests the same.

On the back of said record is the following memorandum: " No ice to Jas. Watson, Admr. of B. Blanton, G. Port."

The ¡laintiff then read in evidence the deposition of George Connelly.

Connelly deposes that he has no certain knowledge, but is

under the impression that the notes of the bank of the State of Mississippi were redeemed at the Agricultural Bank in Natchez in 1836. Deponent was clerk in the Agricultural Bank, and acted as such on the 4th of January, 1836; his duty in relation to notes in his possession on the day of their maturity, was to place them in the hands of the teller of the bank, on the opening of the bank at 9, A. M., he having previously entered the number of the note, the name of the person or account to whose credit it was to be passed, the name of the payee, and the amount of the note, and if the same were not paid on the day of its maturity, to receive them again from the teller the next morning. Deponent knows that a note numbered in his handwriting, 2,785, of which C. Jefferson was the payer, and Stephen Duncan the holder, due January 4, 1836, for $1,100, was deposited in said bank for collection, prior to January 4, 1836, and was on that day handed by deponent to the teller, and to the best of deponent's knowledge and belief, remained in the possession of the teller of said bank, during the banking hours of said day, — was not paid, but returned to deponent unpaid, after the close of business hours. Deponent has lately examined the books of said bank in relation to said note, and finds the entries in his own handwriting. The teller was the person authorized to receive payment of notes.

In answer to cross-interrogatories, he states that he has lately refreshed his memory by an examination of the books of the bank, in his own handwriting and kept by himself, and from said sources of information, in aid of his memory, he answers, and answers from his own knowledge. Deponent made the examination the beginning of March, 1849. He knows that the teller was the person authorized to receive payment of all notes placed in his hands on the day of their maturity; said note was placed in his hands on the day it was due, and he was properly authorized to receive payment of it.

The plaintiff then offered to read to the jury the following letter of James Watson to Watt, Burke & Co., with the proof that it had been read on a former trial, and that James Watson was now dead, namely : —

Duncan v. Watson.

"Claiborne County, March 15, 1837.

"Messrs. Watt, Burke & Co.

"Gentlemen,— Mr. Lewis Watson goes down to arrange a note with Dr. Duncan, which Mr. Blanton is indorser on for C. Jefferson, deceased,— and we have this note to arrange with Dr. Duncan, in order to get possession of the note to bring suit on in Louisiana. It may be that he will have to call on you to accept for the amount to Dr. Duncan, at 12 mos. If it cannot be otherwise arranged, please to assist him in taking it up on the best terms, and it will oblige me, and I will consider myself responsible.

"Yours respectfully,

"JAMES WATSON."

The defendant objected to the reading of said letter in evidence, and it was ruled out by the court.

It was then admitted that James Watson was the administrator of Blanton at the maturity of the note, and at the institution of the suit, and that he was now dead.

The plaintiff then offered to read the deposition of Hugh Montgomery, to the following effect: That he had been last indorser of the note sued on ; that soon after the protest, namely, in March or April, 1837, he called on James Watson, administrator of Blanton, to know what arrangement he would make to pay it. Deponent stated to Watson, that he thought he, deponent, was not liable, in consequence of not having received legal notice ; to which Watson replied that he had no excuse of that kind to make, — that he had received legal notice. Deponent asked Watson where he got the notice ; he said in Port Gibson, and it was the regular office where he got his letters and papers. Watson told affiant at the same time, that he would send for his grandson-in-law, L. Watson, on the next day, to Natchez, and have the matter arranged with Dr. Duncan, and get counsel as to how he should proceed to collect the amount from the estate of Jefferson in Louisiana.

The defendant objected to the reading of said affidavit in evidence, and it was ruled out.

The plaintiff then exhibited his release to Hugh Montgomery, and offered Montgomery as a witness to prove the foregoing facts. The defendant objected, and his testimony was not allowed to be given.

The plaintiff then proved by Montgomery, that Port Gibson was the post-office, at which James Watson received his letters and papers at the maturity of said note in 1836, and that it was his nearest post-office. That it was called indifferently Gibson Port, and Port Gibson.

The plaintiff then proved by J. B. Thrasher, that N. McDougall was now dead, and that on a former trial he had sworn that he had known James Watson for twenty years, and that Port Gibson was always his post-office, and his nearest one. Thrasher then testified that to the best of his knowledge and belief, the Bank of Mississippi transacted her business at the Agricultural Bank in Natchez, after the Agricultural Bank went into operation. That he had transacted business with the Bank of Mississippi at the Agricultural Bank, and that the Agricultural Bank was in operation and doing business in 1836 in January.

The plaintiff then offered to read from Mitchell's Geography, that Port Gibson was called by both names, Gibson Port, and Port Gibson; this was objected to, and ruled out.

The foregoing was all the evidence in the case.

The following instructions were then given, at the request of the defendant.

1. The plaintiff must establish by satisfactory proof, that the note sued on was presented on the day of its maturity, at the Bank of Mississippi, or to the proper officer of the Bank of Mississippi, at its regular place of business, and that payment thereof was refused, and that upon such refusal of payment, notice of such demand and refusal was given to James Watson, administrator of Blanton, by depositing the same in the post-office at Natchez, in time to go out by the mail of the day succeeding the protest, and directed to the post-office nearest the residence of said Watson, or where he usually received his letters, — and that these facts must be established by proof, and not by conjecture.

2. That although the general rule is, that a sworn public officer is presumed to have done his duty, that principle has no application in a case like the present, and the jury cannot lawfully infer from the fact that the notary was a sworn officer, that he gave notice of protest in a proper manner, and in due time; but these facts must be made out by other proof, or the plaintiff is not entitled to recover.

3. That in weighing testimony, the jury cannot find for the plaintiff on the ground of preponderance of evidence, unless the evidence in the case is sufficient to prove the truth of all the facts on which the plaintiff's right to recover depends.

The plaintiff then asked for the following instructions.

1. The jury are to weigh all the evidence in the cause admitted by the court, and to decide the case according to the weight of evidence, and in favor of that side on which the weight of evidence preponderates.

2. If the jury believe from the evidence, that the note sued upon was deposited for collection at the place it was payable at, and remained there during all the banking or business hours of the day of its maturity, that then such fact amounts in law to a presentation and demand for payment, and dispenses with proof of the same.

3. That if the jury believe from the evidence, that the note sued upon was duly dishonored on the 4th day of January, 1836, by non-payment, and that James Watson, as administrator of Blanton, was notified of non-payment of said note in due time, that then such notice is binding on Lewis Watson, as administrator *de bonis non* of Blanton, and the jury will find for the plaintiff.

4. That the law presumes that every man in his private and official character, does his duty until the contrary is proved. It will presume that all things are rightly done, unless the circumstances of the case overturn the presumption.

5. That if the jury believe from the evidence, that the Bank of Mississippi transacted her banking business at the Agricultural Bank, at the time of the maturity of the note, namely, 4th of January, 1836, and used it as a banking house, that then

presentment and demand of the note at the Agricultural Bank, or proof that the note remained in the Agricultural Bank, during the whole of the banking hours of the day of its maturity, amounts to a legal presentment and demand of said note.

6. That the notarial record of the deceased notary, and the memorandum of the deceased notary on the back of the protest, of " notice to Jas. Watson, Admr. of B. Blanton, G. Port," is legal evidence before the jury for what it is worth, and that it is the province of the jury to determine its meaning.

All of said instructions were given by the court, and the court wrote under them, " fourth instruction of plaintiff given as qualified by the second instruction given on part of defendant." The jury found a verdict for the defendant, and the plaintiff prayed a writ of error to this court.

*J. B. Thrasher*, for appellant.

This case was before the court at a previous term (2 S. & M. 136) upon the same proof that is now presented in the record, and it is there decided that the exclusion of Watson's letter was error. That point is, then, decided by this court. It was, among other strange things, contended in the court below, and perhaps will be in this court, that the admissions of James Watson as administrator to Montgomery, and his letter to Watt, Burke & Co., were inadmissible in evidence against Lewis Watson, as administrator *de bonis non*, against whom the suit had been revived by consent, because there was no privity between them.

This is an unsound principle, and if carried out, would not only exclude the letter and admissions of James Watson, but the direct testimony of James Watson himself, and of every other agent not in privity with Lewis Watson, in the subject-matter in controversy.

The statute of this State, in direct terms, gives the right to revive against an administrator *de bonis non;* which as an incident, consequently carries with it the privity in estate. Hutch. Code, 855.

The case of *Hirst*, administrator *de bonis non*, v. *Smith*, is in point (7 Durnford & East, 178) ; in that case, Lord Kenyon, Ch.

J., says, " The defendant's objection rests on this broad founda-
tion, that there is no privity between the former administrator
and the plaintiff, administrator *de bonis non;* but that propo-
sition is certainly not true in its extent, there is a privity of
estate." In the same case Judge Ashhurst says, " As it is
alleged that the promise was made to a person from whom the
plaintiff deduces his title, and between whom and the plaintiff
there is a privity of estate in law, it is the same as if it had
been stated, that the promise was made to the plaintiff himself,
because the law recognizes the relation (of administrator *de
bonis non.*") 7 Durnford & East, 178.

If there is such a principle as privies in estate, and that there
is such a privity all the authors assert, then it is equally cer-
tain that both administrators were in privity with the same
estate. But it is untrue, as a legal proposition, that the plain-
tiff could not prove the acknowledgment of notice and promise
to pay by other testimony; even admitting that Watson, the
administrator, " had himself in readiness, and announced his
willingness to testify to the point in issue."

The admissions of Watson, as administrator, are evidence
against him in his fiduciary character, and binds the estate of
Blanton, in consequence of the privity between them. The
term privity, denotes mutual, or successive relationship to the
same rights of property. Thus, there are privies in estate, as
donor and donee, lessor and lessee; privies in blood, as heir and
ancestor; privies in representation, as executors and testators,
administrators and intestates. All these are more generally
classed into privies in estate, privies in blood, and privies in
law. The ground upon which admissions bind those in privity
with the party making them, is, that they are identified in inter-
est. 1 Greenl. Ev. § 189. Also § 101, 113, 114.

These admissions by third persons, as they derive their value
and legal force from the relation of the party making them to
the property in question, and are taken as parts of the *res gestæ,*
may be proved by any competent witness who heard them,
without calling the party by whom they were made. The
question is, whether he made the admission; and not merely,
whether the fact is as he admitted it to be. Its truth, when

the admission is not conclusive, may be controverted by other testimony; even by calling the party himself, when competent; but it is not necessary to produce him, his declarations, when admissible at all, being admissible as original evidence, and not as hearsay. 1 Greenl. Ev. § 191.

But in the case of *Waul* v. *Kirkman*, reported in 25 Miss. 620, this court has expressly decided, that a promise, or acknowledgment of a debt by an executor or administrator, is sufficient *primâ facie* evidence of the original validity of the demand, and, therefore, sufficient to justify the verdict of a jury in its favor, in the absence of any other proof, and where the claim is not barred by the statute of limitations. 3 Cushm. 620.

The bill of exceptions taken on the last trial in this cause, shows, that the defendant admitted on the trial, that James Watson was then dead, and consequently could not " have himself in readiness, and announce his willingness to testify to the point in issue." Hence, that the objection to the admission of his letter, and to the testimony of Montgomery, to prove his acknowledgment of notice and promise to pay, no longer existed.

But again, say the defendant's counsel, the admissions of Watson, as administrator, and while administrator in chief, would not bind the estate of Blanton, if proved; that the acknowledgment, or promise of an administrator will not bind the estate of his intestate, and therefore, that the letter and testimony of Montgomery were inadmissible on that ground. It is not understood that such is a principle of law now; or that there ever was a period of time in which it was law. The decision of this court, in the case of *Waul* v. *Kirkman*, is an express adjudication on that point.

In that case the court say, " We recognize fully the authority of the decision made by the court in the case of *Henderson* v. *Ilsley*, 11 S. & M. 9. In that case the court held, that an acknowledgment of a debt, or a promise to pay a debt, barred by the statute of limitations, made by an executor or administrator, would not, as a general rule, revive the debt against the estate. Nor would such a promise or acknowledgment prevent the statute of limitations from continuing to run against a debt,

not barred at the time such promise or acknowledgment was made. But that case did not decide, nor do we believe it to be law, that a promise or acknowledgment of a debt by an executor or administrator, is not sufficient *primâ facie* evidence of the original validity of the demand, and therefore, sufficient to justify the verdict of a jury in its favor, in the absence of any other proof, and where the claim is not barred by the statute of limitations." 3 Cushman, 620.

Hence, it is manifest that the court erred in excluding from the jury the letter of Watson and testimony of Montgomery.

The sixth error assigned is, that the court erred in giving the first, second, and third charges asked by defendant's counsel, as set out in the bill of exceptions. These charges, seeking to tie down the jury to a particular kind of proof, without the exceptions to the rule, are evidently erroneous. In relation to the first; the proof was that the note being payable at a particular place, remained in bank during all of the business hours on the day of its maturity. In such case, demand and refusal to pay need not be proved. 2 S. & M. 482; 7 Wend. 162; 13 Mass. R. 558.

As to the second and third charges, no authority will be cited, though abundant. They were wrong upon general principles, universally acknowledged.

Lastly, it will be contended by defendant's counsel, that the plaintiff has had two new trials in the case, and that the court cannot grant a third. This is untrue, as the very full statement of the case in the commencement will fully demonstrate. But one new trial has been granted to the plaintiff by the circuit court, and that was for an error in the court that granted it, in ruling out testimony, and was granted to correct an error of the court that granted it, not of the jury. It is true the result of the decision of this court, reported in 2 S. & M. 135, was a new trial; but it was an incident consequent upon deciding that the court had erred in ruling out the testimony.

In *Munn* v. *Perkins*, (1 S. & M. 421,) the court say, " The point relied on for reversing the judgment in this case is, that the verdict is contrary to evidence. There have been three concurring verdicts in favor of the plaintiff below." The court

Duncan *v.* Watson.

then go on to say, " but when obtained by misdirection on the part of the court, the error in point of law might still be corrected." 10 Yerger, 499 cited.

The case of *Trott* v. *West*, in 10 Yerger, 499, is full on this point. The Tennessee act says, " that not more than two new trials shall be granted to the same party." This means, say the court, " that when the facts of the case have been fairly left to the jury upon a proper charge of the court, and they have twice found a verdict for the same party, each of which have been set aside by the court; if the same party obtain another verdict it shall not be disturbed. But this act did not intend to prevent the court granting new trials for error in the charge of the court to the jury ; for error in the admission of, or rejection of testimony ; for misconduct of the jury, and the like. This we consider the proper construction of the act, and such has been the uniform practice of the courts under it, since its passage." See 10 Yerger, 499.

*H. T. Ellett*, for appellee.

I. In this case there was no proof of the presentment of the note when payment was demanded, nor was the demand made at the place of payment.

The note was payable at the Bank of the State of Mississippi. The notary merely states that he " went to the cashier of the Bank of the State of Mississippi, and demanded payment," &c.

Protest of a note, not being required by law, " is not evidence of any thing ; " and protest of a bill (which is required) is void, unless it states a presentment of the bill. *Smith* v. *Gibbs*, 2 S. & M. 479 ; *Musson* v. *Lake*, 4 How. (U. S.) 262.

The record in this case was only admissible on the ground that it was a memorandum of a deceased witness, and it proves no more than it states on its face. It does not show a presentment of the note at all, much less a presentment at the place of payment. If it showed a presentment of the note to the cashier, which it does not, that would be no proof of a presentment at the Bank of Mississippi.

The other evidence offered to prove the presentment of the note is wholly insufficient.

Is Connelly's testimony sufficient, of itself, to show a legal presentment and demand of payment of the note, independent of the notarial record? Does the deposit of the note in the Agricultural Bank, and leaving it during banking hours in the possession of the teller of that bank, amount to a good presentment to and at the Bank of Mississippi? This inquiry resolves itself into another and more general one, namely, whether when two or more banks, or merchants, have their places of business under the same roof, a presentment to one is a good presentment to all or any of them. This question requires no answer.

II. There was no actual proof of notice. The only direct evidence on this point is contained in these words, written on the back of the page containing the record of the protest, namely, "Notice to James Watson, Admr. of B. Blanton, G. Port."

This memorandum, not signed or authenticated in any way by the notary, was admitted to go to the jury "for what it was worth;" but as the law requires that a notice containing certain things, should be given in a certain time and manner, and as these facts have to be shown by clear and satisfactory proof, it is not too bold to say that this memorandum proved nothing essential to the case.

In *Downs* v. *Planters Bank,* 1 S. & M. 261, a much fuller and more explicit certificate, signed by the notary, was held to be "no evidence at all" to support a verdict. See also 20 Johns. 381, (383); 4 How. U. S. 274.

Indeed, if it were shown by the clearest evidence, that the notary gave the notice in the proper time and manner, still it would only be a notice of what he had actually done, and as he made no presentment of the note, the notice would be insufficient to charge the indorser.

III. The plaintiff having thus failed to establish the facts on which his right of recovery depended, by direct evidence, sought to supply the deficiency in part by other evidence, namely: —

Duncan *v.* Watson.

1. The letter of James Watson to Watt, Burke & Co., dated March 15, 1837, and,

2. The admission of James Watson made to Montgomery, that he had received legal notice.

This evidence was offered for one of two objects. Either to show a promise by the indorser or his administrator to pay, made with knowledge, that he had been discharged from liability by the laches of the holder (Story's Pro. Notes, § 274; Story on Bills, § 327, 373); or as a mere admission of the receipt of notice.

For the first object supposed, the evidence was properly rejected, for, admitting that an indorser, discharged by laches, may bind himself by a new promise, without any additional consideration; Story on Notes, § 275; it is very clear that an administrator cannot, by such a promise, create or revive a liability against the estate he represents. *Henderson* v. *Ilsley,* 11 S. & M. 9.

Was the evidence, then, competent in the other point of view, — as an admission of the fact of notice?

1. The letter was incompetent, because it did not conduce to prove any such admission. It was not addressed to the plaintiff, and it contains no admission of notice or liability. It is a letter from James Watson to his own commission merchants, introducing to them his relative, Mr. Lewis Watson. What facts does it state or admit? It admits that Lewis Watson goes down to arrange a note of C. Jefferson, that Mr. Blanton is indorser on; and that it is necessary to arrange the note in order to get possession of it for the purpose of bringing suit in Louisiana; and it requests Watt, Burke & Co. to assist in taking it up, if they should be called on to do so. This letter young Watson delivered to Watt, Burke & Co., but he did not arrange the note with Dr. Duncan, nor did he call upon Watt, Burke & Co. to assist him. The letter was not acted upon. Why not? Is there any supposition more probable than that, upon inquiry, it was found that the indorser was not liable?

Does the letter contain any evidence to charge the estate? Can any fact, favorable to the plaintiff, be legitimately drawn from its contents? Does it admit any fact, or conduce to prove

any fact, on which the right to recover depends ? Would it be evidence even if written by the indorser himself ?

It is settled that an indorser making exertions, upon a supposition of his liability to obtain payment from a prior party ; or a conditional promise to pay in a certain time or manner, will not waive presentment or due notice. Story's Pro. Notes, § 278, citing 10 Mass. 84 ; 11 Johns. 180 ; 2 Campb. 107.

How Dr. Duncan got possession of this private letter must remain a mystery.

2. The letter, and the verbal admission offered to be proved by the testimony of Montgomery, were also correctly ruled out, because the plaintiff had wholly failed to show that the note had ever been presented for payment, if indeed his testimony did not conclusively prove that no such presentment had in fact been made. The whole case is in the record. The evidence to prove presentment and demand was first offered, and that part of the case having broken down, the question of notice became wholly immaterial and irrelevant, and the evidence on that point, if admitted, was only calculated to embarrass and mislead the jury.

3. Again, both the letter and the verbal admission were properly ruled out as hearsay, inasmuch as James Watson, by whom they were made, was not a party to the suit, nor did he occupy any relation to the case, that could make his admissions evidence.

He is not a party to the record, nor interested in the result of the cause, nor the agent or attorney of Blanton, the indorser, or of Lewis C. Watson, the administrator *de bonis non.*

The declarations of one executor or trustee are not admissible even against his co-executor or co-trustee, because they have not a joint interest, but only a mere community of interest. 1 Greenl. Ev. § 176. And this is not so strong a case as that of co-executors, for there is not even a community of interest between an administrator and an administrator *de bonis non.*

*Primâ facie,* these admissions of James Watson are hearsay. If admissible, they must come within some established exception to the general rule. There must be some rule of the law of evidence to which their competency can be referred.

Duncan *v.* Watson.

It was argued below that the present defendant, as administrator *de bonis non*, is in privity with the former administrator, by whom the admissions were made, and therefore the admissions of the latter are evidence, and 1 Greenl. Ev. 291, § 189, was cited.

Privity denotes " mutual or successive relationship to the same rights of property," and they are classed into privies in estate, privies in blood or representation, and privies in law. The instances put illustrate what is meant by this " mutual and successive relationship." Thus, " privies in estate are donor and donee, lessor and lessee, and joint-tenants ; privies in blood are heir and ancestor, and coparceners ; privies in representation are executor and testator, administrator and intestate ; privies in law, where the law, without privity of blood or estate, casts the land upon another, as by escheat." In all these cases, the statements made by the prior owner or possessor of property, are evidence against those claiming under him, to qualify his right ; and hence the admissions of a testator or intestate are evidence against the executor or administrator to charge the assets with a debt.

But there is no privity whatsoever, between the first administrator and the administrator *de bonis non*. The latter does not claim through or under the former, but he takes by " title paramount," directly from the intestate. *Grout* v. *Chamberlain*, 4 Mass. 611; *Underhill* v. *Devereux*, 2 Saund. R. 72, n. ; *Turner* v. *Davies*, 2 Saund. 148 f.; Toller, Ex. 448, 449; 2 Tidd, Pr. 1030; 10 Conn. 68, vol. 5, 2d series; 6 Conn. 170, vol. 1, 2d series; 1 Serg. & R. 549.

The administrator *de bonis non* takes nothing but property remaining in specie, unadministered by the first administrator. *Kelsey* v. *Smith*, 1 How. 68; *Prosser* v. *Yerby*, Ib. 87. And no case has been found in which the admissions of the first administrator have been received as evidence against him.

It is true, that suits pending and judgments obtained against an administrator, may now, by virtue of the act of 1846, passed long after these admissions were made, be revived against the administrator *de bonis non*. Hutch. Co. 855.

But this is in favor of the creditor, to save his action, which

might be barred by limitation, if he were compelled to bring a new suit, which was the law here before that act, as it was in England before the 17 Car. 2. It creates no privity between the administrator and the administrator *de bonis non*. It gives the latter a remedy, and subjects him to a liability, under new circumstances, by continuing legal proceedings already instituted, but it does not alter the tenure by which he holds the property, or make him privy in estate, in blood, or in law, with the former administrator. He still takes by " title paramount " to the administrator, namely, directly from the intestate; and a judgment rendered against him in a proceeding under this statute, will only bind the property that thus comes to his hands in 'specie, and will not be evidence to charge the assets in the hands of the first administrator.

If a legal privity is created by the act of 1846, the admissions are still incompetent, for, to make them admissible the relation that renders them competent must exist at the time they are made. 1 Greenl. 281, § 179.

The decision made in this cause, in relation to the admission of this testimony, reported in 2 S. & M. 121, was made under very different circumstances from what now exist. Then James Watson was a party to the suit, and, as such, his declarations were held admissible against him, he having failed to appear in court and express his willingness to give evidence. Had he done so, it is decided that these admissions would not have been admissible even against himself.

Now, however, James Watson is not a party to the record, and the suit stands, to all intents and purposes, precisely as if it had been originally brought against the administrator *de bonis non*. The present defendant holds nothing through or under James Watson, and there is nothing to redeem this testimony from the character of naked hearsay.

They were not declarations against the interest of James Watson at the time, and admissible on that ground after his death, for he never had any interest that could possibly be affected by them.

It is hardly necessary to discuss the other points that may be raised upon the record.

Duncan *v.* Watson.

1. The testimony of Vernon as to the usage and custom of the notary in making demand and giving notices, was clearly inadmissible. *Halliday* v. *Martinet*, 20 Johns. 168, 176.

2. So was the opinion of the witness as to what was meant by the memorandum on the back of the record. *Duncan* v. *Watson*, 2 S. &. M. 135.

3. The fourth charge for the plaintiff was properly modified by a reference to the second for the defendant, for the presumption *omnia rite esse acta*, cannot be accepted in lieu of proof of presentment and notice. *Downs* v. *Planters Bank*, 1 S. & M. 276 ; *Musson* v. *Lake*, 4 How. U. S. 274–279.

*John B. Coleman*, on the same side, filed an elaborate argument.

Mr. Justice HANDY delivered the opinion of the court.

This case has been here on a former occasion, and is reported in 2 S. & M. 121.

The action was instituted against James Watson, as administrator of Benjamin Blanton, deceased, on a promissory note on which Blanton was indorser, and which fell due after his death. The declaration avers due presentment and non-payment of the note on the day of its maturity, which was after the death of Blanton, and that notice thereof was given to James Watson, the administrator. After the former decision in this court, James Watson settled his final account as administrator with the probate court and was discharged, and afterwards, by consent of parties, the suit was abated as to him, and the present defendant, who had been appointed administrator *de bonis non* of the estate, was made a party; and in that condition of the case, the judgment now before us was rendered against the plaintiff, who has taken his writ of error.

On the trial in the court below, the plaintiff, in order to show notice of presentment and non-payment, offered in evidence a letter written by James Watson to Watt, Burke & Co., while he was administrator, tending to show an admission of the claim, and also offered to prove by Montgomery, a competent witness, that in March or April, 1837, James Watson, whilst

he was administrator, admitted to him that he had received legal notice of the presentment and non-payment of the note. This evidence was objected to by the defendant, and was not permitted to go to the jury, which constitutes the principal ground of error insisted upon by the plaintiff.

In the former decision of the case by this court, it was held that this same testimony was competent, and that it was improperly excluded on the first trial. But it is now urged, in behalf of the defendant, that although the testimony was admissible in the situation of the case as it then stood, and while James Watson was a party to the suit, it cannot be admitted against the administrator *de bonis non*, because there is no privity of interest or estate between the original administrator and the administrator *de bonis non*, and, therefore, that the admissions of the former cannot bind the latter; and again, because, if such statements were competent, the former administrator, being no longer a party to the suit, should have been produced as a witness, or his deposition taken.

We do not consider these positions to be well founded. It is true that, in many respects, there is no privity between an original administrator and an administrator *de bonis non*. Thus, the former is not accountable to the latter for his administration of the estate, nor, at common law, could the administrator *de bonis non* have a *scire facias* upon a judgment obtained in the name of the administrator. *Allen* v. *Irwin*, 1 Serg. & Rawle, 554. But in many respects the acts of the administrator, within the sphere of his duty and power, are obligatory upon his successor, so far as to charge the estate. They bind the administrator *de bonis non*, because the estate came to his hands charged with them by acts of the administrator which he might legitimately do in the management of the estate while in his hands. If this were not so, the admission of the payment of a debt due the estate, or the execution of a receipt therefor, which is but another form of admitting payment by the administrator, would not bind the estate in the hands of his successor; and the administrator would be capable of doing no act, however legitimate, to the management of the estate, and in whatever good faith done, that could create a liability upon the

estate, or continue one already existing. Under this rule, if the intestate, in his lifetime, had contracted to pay a sum of money by a stated time, upon a third person performing a certain act, and the intestate died before the time appointed, and the other party complied with his contract by the day, the admission by the administrator that the other party had complied, would not be sufficient to give him the benefit of the contract against the estate. Such a principle, if carried out, would produce the greatest inconvenience to estates, if it would not make the administration of them impracticable.

We take it to be clear, that an administrator may make admissions which will bind the estate, provided he acts in good faith and with due regard to the best interest of the estate, and in a matter necessarily connected with its administration; and this is especially the case when, as in this instance, the contract, which was incomplete at the death of the intestate, devolves upon the administrator who stood in the place of the intestate when the note became due. It would appear to be manifest, that if he was capable of receiving notice in such a case, which is not doubted, he would also be capable of admitting that he had received notice, and that the one act would bind the estate as fully as the other. Suppose the administrator had been present when the note was presented for payment, could he not have waived the proof of notice in writing or verbally, and would not such waiver have bound the estate? It is clear that it would, because it would be an act properly connected with his trust, and which might well be done to save expense to the estate.

In this case, the admission relates to a fact which transpired with the administrator himself, as the necessary consequence of the intestate's death. He stood in the place of the intestate in receiving notice, and therefore had the same power to do any thing in relation to it to make the contract obligatory upon the estate that the intestate would have had.

It follows, from this view, that the evidence was admissible in the suit against the administrator *de bonis non*, and was improperly rejected. And if this conclusion be correct, there was no necessity for calling the original administrator as a wit-

ness. The plaintiff was entitled to the benefit of his admissions as evidence, and though he may have called him as a witness, he was not compelled to do so. But, in addition to this, the record shows that he was dead at the time of the trial, and we do not perceive on what principle the plaintiff was obliged to anticipate the death of a party so situated and take his deposition *de bene esse*, and, on failure to do so, to lose the benefit of his admissions.

But it is insisted, in behalf of the defendant, that this evidence was immaterial, and that a verdict ought not to have been rendered for the plaintiff if it had been admitted, because there was no sufficient proof of presentment of the note at the time and place of payment, without which the acknowledgment of notice of non-payment was unavailing.

The note was payable, on its face, " at the Bank of the State of Mississippi." There was testimony before the jury tending to show that, on the day of the maturity of the note, it was in the hands of the officers of the Agricultural Bank at Natchez, where it had been previously deposited for collection, and that it remained in that bank during the whole of that day, and was unpaid; and further, that at and before that time, the business of the Bank of the State of Mississippi was transacted at and through the Agricultural Bank. We do not intend to decide the question, or express any opinion, whether the testimony proved these facts. That was a matter for the jury to determine; and we only intend to say, that from the testimony, they might have found that the note was in the Agricultural Bank on the day of its maturity, and that the business of the Bank of Mississippi was transacted at and through that bank. The question was properly submitted to the jury under the fifth instruction given at the instance of the plaintiff, and if the opinion of the jury had been in the affirmative, they would have had the right to find from the evidence that presentment was made; for it is not denied, that if the note remained at the place of business of the Bank of Mississippi during the day of its maturity, that that was a sufficient presentment.

Although the jury, then, might have been satisfied that the point of presentment was in favor of the plaintiff, yet they

could not find a verdict in his favor in the absence of proof of notice of the presentment and non-payment. The admissions of Watson upon that point were, therefore, most material to the plaintiff's recovery, and the exclusion of that part of the evidence operated directly to his prejudice.

The instructions given at the instance of the defendant are objected to by the plaintiff; but, taken in connection with those given at the instance of the plaintiff, we think that the law was properly stated. The first instruction of the defendant, which might have been construed too rigidly in relation to the presentment of the note at the Bank of Mississippi, was properly qualified by the fifth instruction, at the plaintiff's instance; and the two instructions, taken together, stated the correct rule. So the fourth instruction of the plaintiff was properly qualified by the second, given at the instance of the defendant.

The third instruction in behalf of the defendant is correct, when properly understood. It is, "that in weighing the testimony, the jury cannot find for the plaintiff on the ground of preponderance of evidence, unless the evidence in the case is sufficient to prove the truth of all the facts on which the plaintiff's right to recover depends."

In order to prevent misapprehension on the new trial, this instruction should be qualified in the latter part of it, by adding to it, "to the satisfaction of the jury;" for otherwise, the jury might think that, in weighing the preponderance of evidence, nothing should be taken into consideration but the facts which were directly and positively proved.

The judgment is reversed, a new trial awarded, and the case remanded.